## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CEC ENTERTAINMENT, INC., *et al.*, | ) | Case No. 20-33163 (MI) |
|  | ) |  |
| *Debtors.*[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |
| CEC ENTERTAINMENT, INC., | ) |  |
|  | ) |  |
| *Plaintiff,* | ) |  |
| v. | ) | Adv. Proc. No. [_____] |
|  | ) |  |
| DSL OVERLAKE, LLC, | ) |  |
|  | ) |  |
| *Defendant.* | ) |  |

### CEC ENTERTAINMENT, INC.'S ORIGINAL ADVERSARY COMPLAINT

Debtor CEC Entertainment, Inc. ("**CEC**"), as debtor and debtor in possession, by its undersigned attorneys, respectfully states the matters set forth below.

### NATURE OF THE COMPLAINT

1.      CEC files this original adversary complaint (the "**Complaint**") against Defendant DSL Overlake, LLC ("**Defendant**" or "**DSL**") (collectively with CEC, the "**Parties**").

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BHC Acquisition Corporation (0947); CEC Entertainment Concepts, L.P. (3011); CEC Entertainment Holdings, LLC (9147); CEC Entertainment, Inc. (5805); CEC Entertainment International, LLC (8177); CEC Entertainment Leasing Company (4517); CEC Leaseholder, LLC (N/A); CEC Leaseholder #2, LLC (N/A); Hospitality Distribution Incorporated (5502); Peter Piper Holdings, Inc. (6453); Peter Piper, Inc. (3407); Peter Piper Texas, LLC (6904); Peter Piper Mexico, LLC (1883); Queso Holdings Inc. (1569); SB Hospitality Corporation (4736); SPT Distribution Company, Inc. (8656); and Texas PP Beverage, Inc. (6895).  The Debtors' corporate headquarters and service address is 1707 Market Place Boulevard #200, Irving, TX 75063.

2.      By this Complaint, CEC seeks a judgment from this Court declaring that:  (1) CEC properly exercised its option to extend the term of its Lease (as defined below) with DSL until August 31, 2025, at a Prevailing Market Rate; and (2) the Lease was not terminated prior to June 24, 2020 (the "**Petition Date**").

## JURISDICTION AND VENUE

3.      This adversary proceeding is commenced pursuant to Rule 7001(9) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")—which authorizes an adversary proceeding to obtain a declaratory judgment relating to the other matters described in Bankruptcy Rule 7001—as well as section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and 28 U.S.C. § 2201.

4.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b), Bankruptcy Rule 7008, and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Local Rules**").

6.      CEC consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the Parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      The Court has personal jurisdiction over DSL pursuant to Bankruptcy Rule 7004(f).

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409.

## PARTIES

9.      Plaintiff CEC Entertainment, Inc. is a Kansas corporation with its principal place of business at 1707 Market Place Boulevard #200, Irving, Texas 75063.

10.     Upon information and belief, Defendant DSL Overlake, LLC is a Washington limited liability company located at 11012 Canyon Road E., Suite 8-943, Puyallup, Washington 98373.

## FACTUAL BACKGROUND

11.     CEC and the Debtors, together with their non-debtor affiliates, are a leading family entertainment and dining company with a global network of dining, entertainment, and arcade centers that are operated and franchised under the names "Chuck E. Cheese" and "Peter Piper Pizza."  DSL is the landlord at a Chuck E. Cheese's restaurant located at 2239 148th Avenue NE, Bellevue, Washington (the "**Premises**").

12.     On August 30, 1995, DSL's predecessor-in-interest, as landlord, and CEC's predecessor-in-interest, as tenant, entered into a lease concerning the Premises (the "**Lease**").  A true and correct copy of the Lease is attached hereto as **Exhibit 1**.  The Lease is governed by the laws of the State of Washington and defines Prevailing Rental Rate as "the prevailing rental rate for similar spaces of similar size and use, for comparable terms in the Overlake area."  Ex. 1 at §§ 3(c), 18(i).  Pursuant to the Lease, DSL's exclusive remedy in the event of CEC's default is to terminate the Lease.  *Id.* § 16(b).

**A.     CEC Timely and Validly Exercised Its Unilateral Option to Extend the Lease with DSL through August 31, 2025**

13.     The initial term of the Lease is fifteen years, or until "midnight of August 31, 2010." Ex. 1 at § 3(a).  Section 3(c) of the Lease provides CEC the unilateral "option to renew th[e] Lease for three additional terms of five (5) years each (the "**Extended Periods**")."  *Id.* § 3(c).

14.     Each time the option to renew is exercised, section 3(c) of the Lease requires that CEC:

- "not be in default in the performance of any of the terms or conditions contained in th[e] Lease";

3

- renegotiate the Extended Periods "to reflect prevailing rents in the surrounding area" (the "**Prevailing Rental Rate**");

- notify DSL "at least 120 days prior to the expiration of the original term"; and

- deliver or mail to DSL "a written notice setting forth the fact that [CEC] is exercising said option to renew."

15.     CEC exercised the options for the first two Extended Periods in 2010 and 2015, respectively.  Specifically, on March 2, 2015, CEC exercised its option to renew for the second Extended Period by sending a letter (the "**2015 Extension Letter**"), which states:

> Be advised that pursuant to that certain Lease dated August 30, 1995 between DSL Overlake LLC, ("Landlord") and Seattle Entertainment Concepts, Inc., predecessor in interest to CEC Entertainment, Inc., ("Tenant"), Tenant hereby exercises its right to renew the Lease for a period of five (5) years commencing on September 1, 2015 at "Prevailing Rental Rate", as defined in the lease.

2015 Extension Letter; a true and correct copy of which is attached hereto as **Exhibit 2**.

16.     The Parties subsequently negotiated the new "Prevailing Rental Rate," and DSL recognized the extended term *without* requiring a mutually-executed amendment or extension to the Lease.[2]

17.     CEC likewise properly and timely exercised its option to renew the Lease for the third and final Extended Period.  On March 5, 2020—***nearly 180 days before the Lease was otherwise set to expire*** on August 31, 2020 (and 60 days in advance of the extension deadline)—CEC, which was not in default of the Lease, exercised its option to extend the Lease until August 31, 2025, by way of regular mail and e-mail to DSL, attaching a fully executed notice entitled:  "NOTICE OF TENANT'S EXERCISE OF THIRD OPTION" (the "**2020 Notice of Extension**").  A true and correct copy of which is attached hereto as **Exhibit 3**.

---

[2] Notably, the first extension was also extended without a mutually-executed amendment or extension to the Lease.

4

18.     The Notice of Extension provided, in pertinent part:

Dear Landlord:

Be advised that pursuant to the Lease, Tenant hereby exercises its right to renew the Lease for a period of five (5) years commencing on **Tuesday, September 1, 2020**.

Tenant hereby accepts Landlord's Prevailing Rental Rate (as defined in the Lease) as offered in an email to Mr. Tony Bowen on February 10, 2020 at the monthly rental rate of **$24,944.79** for the entire option term (being $27.50 per square foot on an annualized basis).

Ex. 3.

19.     The 2020 Notice of Extension and 2015 Extension Letter are nearly identical in both substance and form, except that in the 2020 Notice of Extension, CEC also accepts the previously negotiated Prevailing Rental Rate offered by DSL.   The Lease was properly extended by CEC's proper exercise of its third Extended Period.

**B.      CEC Negotiated Rent Relief Measures with DSL after COVID-19 Impacts**

20.     Shortly after providing the 2020 Notice of Extension, CEC began to experience the devastating financial impacts and uncertainty arising from the COVID-19 pandemic.  As it has done with many of its landlords nationwide, CEC engaged in sustained, good-faith negotiations with DSL regarding rent deferral, abatement, and other issues stemming from COVID-19.

21.     On June 16, 2020, just days before the Petition Date, DSL—but not CEC—executed a proposed lease amendment (the "**Draft Lease Amendment**").  The Draft Lease Amendment, if effective, would have, *inter alia*, deferred CEC's rent obligations from June 1, 2020 through August 31, 2020, to be repaid in twelve monthly installments beginning January 1, 2021, while also requiring CEC to reconcile all delinquent rent and fees (the "**Unpaid Rent**") within ten days of a fully executed agreement.  The Draft Lease Amendment also purported to memorialize the extended term and the Prevailing Rental Rate CEC agreed to pay in its Notice of Extension—a practice not followed by the Parties for the first two extensions.

22.     Notably, DSL did not take any action to terminate CEC's right to possession at any point prior to the Petition Date.  *See* Ex. 1 at § 16(b) (providing DSL's exclusive remedy).

**C.      Negotiations Stall as DSL Threatened Eviction and Took the Position that the Lease Will Terminate on August 31, 2020**

23.     The Parties continued negotiating the Draft Lease Amendment proposed by DSL after the Petition Date.  CEC explained to DSL that while CEC remained amenable to reconciling certain unpaid expenses, because the Unpaid Rent is a pre-petition expense, the Bankruptcy Code requires that such repayment be deferred until the Debtors officially assume the Lease.  CEC also informed DSL that any repayments remained subject to an amortization schedule approved by the Debtors, which may not commence until January 2021.

24.     While DSL initially appeared to accept these alterations to the Draft Lease Amendment, negotiations soon broke down when DSL threatened to evict CEC to recapture the Premises.  Negotiations between the Parties ultimately reached an impasse once it became clear that DSL was refusing to recognize CEC's extension through August 2025 unless CEC capitulated to DSL's unreasonable (and in some cases unlawful) demands.

25.     For example, in a July 22, 2020 letter to CEC (the "**July 22 Letter**"),[3] DSL claimed "the lease runs out on August 31, 2020 and given the breaches, the last of the extension [sic] may not be exercised, per the Lease Section 3.c."  Ex. 4.  The July 22 Letter also stated that "[u]ntil there is a fully executed lease amendment/extension, we ask that CEC plan accordingly to return possession at the end of the lease term."  *Id.*

---

[3] A true and correct copy of the July 22 Letter is attached hereto as **Exhibit 4**.

26.     In follow-up discussions, counsel for DSL acknowledged that the 2020 Notice of Extension extended the Lease but (without basis) disputed its enforceability absent a mutually-executed lease amendment and payment of prepetition rent.  *See* Ex. 4.

27.     On August 11, 2020, DSL again claimed that "CEC has breached the lease presently" (the "**August 11 Letter**").[4]  The August 11 Letter also stated that "[i]f CEC wants to continue to lease this premises then it needs to execute the proffered extension, [sic] pay the back due rents," and "if CEC is not willing to sign such extension, it needs to comply with the lease and vacate as required."  *Id.*  Finally, the August 11 Letter disputed the Prevailing Rental Rate that CEC agreed to in the 2020 Notice of Extension, calling it "conservative at this point."  *Id.*  Despite the Lease's unambiguous definition of "Prevailing Rental Rate" as "the prevailing rental rate for similar spaces of similar size and use, for comparable terms in the Overlake area," Ex. 1 at § 3(c), DSL contends (without basis) that such rate "is now in excess of the $27.50 [per square foot] offered" because "there has been significant interest expressed in this location as DSL Overlake has been forced to consider re-letting the premises given CEC's difficulties."  *See* Ex. 5.

28.     At bottom, DSL's refusal to recognize CEC's valid 2020 Notice of Extension, which complied in all respects with the plain terms of the Lease and the course of conduct established by the Parties in the two previous extensions, is precluding all constructive negotiations in connection with the Debtors' decision to assume certain leases.  Further, given DSL's breach allegations and its contention that the Lease expires on August 31, 2020, CEC does not know whether or when DSL may take action to terminate CEC's possession of the Premises.[5]  Both

---

[4] A true and correct copy of the August 11 Letter is attached hereto as **Exhibit 5**.

[5] *See* email correspondence from Martin Burns; a true and correct copy of which is attached hereto as **Exhibit 6**.

issues would be resolved by a judgment declaring that CEC extended the Lease until August 31, 2025, and that DSL had not validly terminated the Lease prior to the Petition Date.

## COUNT 1: DECLARATORY JUDGMENT

29.     CEC re-alleges and incorporates the matters set forth in each of the preceding paragraphs as if fully set forth.

30.     CEC's predecessor-in-interest entered into a Lease with DSL's predecessor-in-interest.  The Lease is a valid, enforceable contract.

31.     As explained above, pursuant to the Lease's express terms, an option to extend is accepted when CEC, when not in default, (1) renegotiates the Extended Period to reflect the Prevailing Rental Rate, (2) notifies DSL at least 120 days prior to the expiration of the original term, and (3) delivers or mails to DSL a written notice setting forth the fact the lessee is exercising the option to renew.

32.     CEC was not in default when it sent notice to DSL by email and by regular mail that it was exercising its option to renew the Lease at the Prevailing Rental Rate offered by the Landlord on March 5, 2020, over 120 days prior to the expiration of the previous extended term.

33.     As described herein, CEC completed all conditions precedent to validly exercise its option to extend the Lease for a third five-year term beginning on September 1, 2020.

34.     "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *see also* Fed. R. Bankr. P. 7001.

35.     As explained above and further demonstrated by Exhibits 1–6, an actual, justiciable controversy exists between the Debtors and DSL as to whether:  (i) the Lease was a valid and enforceable agreement as of the Petition Date; (ii) CEC properly exercised its unilateral option to

extend the Lease until August 31, 2025; and (iii) CEC's March 5, 2020 agreement to accept the Prevailing Market Rate was binding.

36.    Accordingly, this Court has the power to adjudicate the rights of the Parties with respect to this controversy and should grant declaratory relief under 28 U.S.C. § 2201.

37.    Specifically, CEC asks the Court to declare that:

    i.    As of the Petition Date, the Lease was a valid and enforceable agreement.

    ii.    As of March 5, 2020, the Lease was properly extended until August 31, 2025.

    iii.    The Prevailing Rental Rate of $27.50 per square foot CEC agreed to on March 5, 2020 shall be the rental rate for the period between September 1, 2020, and August 31, 2020.

    iv.    Under the valid extension, the Lease expires on August 31, 2025.

## V. **PRAYER FOR RELIEF**

WHEREFORE, CEC respectfully requests that the Court grant the declaratory relief requested herein against DSL and grant CEC such other and further relief, at law or in equity, as the Court deems just and proper.

Dated:  August 29, 2020
      Houston, Texas

Respectfully submitted,

_/s/ Alfredo R. Pérez_
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com
       Clifford.Carlson@weil.com
-and-
WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Scott Bowling (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Email:  Matthew.Barr@weil.com
       Ryan.Dahl@weil.com
       Scott.Bowling@weil.com
-and-
WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
Amanda Pennington Prugh (24083646)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7877
Facsimile:  (214) 746-7777
Email:  Paul.Genender@weil.com
       Amanda.PenningtonPrugh@weil.com
*Attorneys for Debtors*
*and Debtors in Possession*

# *EXHIBIT 1*

# LEASE

Bellevue

± 3199

1. Parties. This Lease, dated, for reference purposes only, August 30, 1995, is made by and between DDF&S, (herein called "Landlord"), and Seattle Entertainment Concepts, Inc., (herein called "Tenant").

2. Premises. Landlord hereby leases to Tenant and Tenant leases from Landlord for the term, at the rental, and upon all of the conditions set forth herein, that certain real property and improvements thereon situated in the County of King, State of Washington, and described as follows:

> THAT PORTION OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 27, TOWNSHIP 25 NORTH, RANGE 5 EAST, W.M. IN KING COUNTY, WASHINGTON DESCRIBED AS FOLLOWS:
>
> Beginning at the Northeast corner of said subdivision; thence North 88°16'05" West along the North line thereof a distance of 50.00 feet;
> thence South 1°19'20" West a distance of 40.00 feet to the South margin of an 80.00 foot right-of-way known as N.E. 24th Street;
> thence North 88°16'05" West along said South margin a distance of 572.75 feet;
> thence South 0°06'39" East a distance of 179.33 feet and the True Point of Beginning of the tract herein described;
> thence South 0°06'39" East a distance of 181.64 feet;
> thence South 88°16'05" East a distance of 411.15 feet;
> thence North 1°19'20" East a parallel with the East line of said Section 27 a distance of 85.00 feet;
> thence North 88°16'05" West 150 feet;
> thence North 01°19'21" East 81.55 feet;
> thence South 88°16'05" East 86.75 feet;
> thence North 00°06'39" West 217.01 feet to the South margin of N.E. 24th Street;
> thence West along said South margin of N.E. 24th Street 61.07 feet;
> thence South 0 06 39 East 202.00 feet;
> thence North 88 16 05 West 291.00 feet to the True Point of Beginning
>
> Situated in the City of Bellevue, County of King, State of Washington.

Said property, including the land and all improvements thereon, is herein called the "Premises" and is currently zoned General Commercial. A map showing the Premises outlined in red is attached hereto as Exhibit A and by this reference made a part hereof.

For the purposes of this Lease it is agreed that the Tenant occupies approximately fifty percent (50%) of the total rentable and common area of the property in which the herein leased Premises are situated. Tenant's actual percentage, when added to the percentage allocated to all other tenants or spaces, does not exceed one hundred percent (100%) of the total rentable and common area space in said property.

Exhibit "A"

3.  Term.

a)  Term.  The term of this Lease shall be for fifteen (15) years, commencing September 1, 1995 and ending at midnight of August 31, 2010, unless sooner terminated pursuant to any provision hereof.

b)  Delivery of Possession.  Tenant shall be deemed to have taken possession of the Premises when Landlord delivers possession of the Premises to Tenant free and clear of tenancies and encumbrances and Tenant accepts such possession.  Tenant's obligations hereunder are subject to approval of the lease and the site by Showbiz Pizza Time, Inc. and Tenant's ability to obtain building permits.

c)  Option To Renew.  On condition that the Tenant shall not be in default in the performance of any of the terms or conditions contained in this Lease, Landlord does hereby grant to the Tenant an option to renew this Lease for three additional terms of five (5) years each (the "Extended Periods"), upon the same terms and conditions as set forth in the attached lease agreement, EXCEPT that rental for the Extended Periods shall be renegotiated to reflect prevailing rents in the surrounding area (the "Prevailing Rental Rate").  In order to exercise this option, Tenant shall be required to notify the Landlord at least 120 days prior to the expiration of the original term set forth herein.  The option shall be exercised by delivery or mailing to the Landlord a written notice setting forth the fact that the Tenant is exercising said option to renew.  If Landlord and Tenant fail to reach agreement on rental terms for the renewal period at least 90 days prior to expiration, then the Prevailing Rental Rate shall be the rental rate for the renewal term.  As used herein, the Prevailing Rental Rate shall be the prevailing rental rate for similar spaces of similar size and use, for comparable terms in the Overlake area.  If Landlord and Tenant cannot agree, prior to 60 days from the expiration of this Lease, upon the Prevailing Rental Rate for the Overlake area, then the Prevailing Rental Rate shall be set according to the Commercial Arbitration Rules of the American Arbitration Association then in effect.  Such determination shall be final and binding upon the parties.  In recognition that the Prevailing Rental Rate may not be determined until after the commencement of the Extended Periods, Tenant shall pay, during the Extended Periods until the Prevailing Rental Rate is determined, 110% of the amount of Rent then in effect.  If the Prevailing Rental Rate is determined to be greater than such amount, Tenant shall pay Landlord, within thirty (30) days after written request therefor, the difference between the amount required by such determination of the Prevailing Rental Rate, and the amount of Rent theretofore paid by Tenant during the Extension Period.  If less, Landlord shall refund the difference to Tenant.

4.   Rent.

   a)   Base Rent. Tenant shall pay to Landlord as rent ("Base Rent") for the Premises equal monthly installments which shall be derived by multiplying the square footage of the building footprint using the BOMA standard of measuring from exterior walls times fourteen dollars ($14) per square foot for years one through five; times fifteen dollars ($15) per square foot for years six (6) through ten (10); and times sixteen dollars ($16) per square foot for years eleven (11) through fifteen (15), advance, on the first day of each month of the term hereof. Square footage shall be derived by actual measurement of the square footage of the building footprint using the BOMA standard of measuring the exterior walls upon completion of pre-opening renovations. That number shall become the mutually agreed upon square footage number for the duration of the Lease. Rent for any period during the term hereof which is for less than one (1) month shall be a pro rata portion of the monthly installment. Rent shall be payable without notice or demand and without any deduction, offset, or abatement, in lawful money of the United States of America to Landlord at the address stated herein or to such other persons or at such other places as Landlord may designate in writing.

   b)   Additional Rent. In addition to the Base Rent, Tenant shall pay additional rent commencing thirty-one (31) months through fifteen (15) years. In each of the lease years thirty-one (31) months through fifteen years additional rent shall be computed by multiplying the Base Rent (Section 4(a) above) times the CPI Percentage Increase for the immediately prior year. After the first year in which additional rent is due, the CPI will be calculated on a compound basis. In no event shall the amount of Additional Rent in any one year, be greater than five percent (5%) of Base Rent. Such Additional Rent shall be paid in twelve equal monthly installments in addition to the Base Rent. CPI, as used herein, shall mean the U.S. City Average, All Urban Consumers, All items (1982/84=100).

   c)   Delay in Commencement of Rent. Rent shall commence on the one hundred and twentieth (120th) day following the receipt to the building permit from the City of Bellevue, Washington or the first day of commencement of the Premises' use as a restaurant, whichever occurs first. Tenant shall use his reasonable best efforts to accomplish the building process as expeditiously as possible.

   Tenant agrees that Tenant will be responsible on a personal guarantee basis by all four owners for three (3) months of rent on a triple-net basis if the project fails for any reason before the commencement of rent takes place. This amount is not meant as a punitive measure or as a fine, but rather an acknowledgement of the fact that the Landlord will

have this property off the market in anticipation of Tenant's successful commencement of its business operation.

d) <u>Personal Guarantee of Rent</u>. Tenant agrees that Tenant will be responsible on a personal guarantee basis by owners Alan D. Dudley, Thomas J. Maginnis, Patrick D. Maginnis and Brian T. Maginnis of the business Seattle Entertainment Concepts, Inc. for the full liability of the Tenant to the Landlord for any amount, including rent, deposits and default payments, owing to the Landlord. This personal guarantee is unlimited and shall be in effect for a period of ten (10) years. Tenant further agrees that Tenant will be responsible on a personal guarantee basis by owners Alan D. Dudley and Thomas J. Maginnis for liability of the Tenant to the Landlord for as much as one (1) years' rent for a period beginning in year eleven (11) and extending to year fifteen (15) of the lease period.

5. <u>Security Deposit</u>. Tenant shall pay Landlord upon the execution of this lease the sum equivalent to the first month's rent, calculated herein to be Twelve Thousand, Six Hundred Ninety-Nine Dollars and Sixteen Cents ($12,699.16) as a Security Deposit for the faithful performance by the Tenant of all the terms, covenants and conditions of this Lease, to be kept and performed by the Tenant during the term hereof. If Tenant defaults with respect to any provision of this Lease, including, but not limited to the provisions relating to the payment of rent, the Landlord may (but shall not be required to) use, apply or retain all or any part of this security agreement for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default or compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default.  If any portion of said deposit is so used or applied, Tenant shall within five (5) days of written demand therefore, deposit cash with the Landlord in an amount sufficient to restore the security deposit to its original amount.  Tenant's failure to do so shall be a default under this Lease.  Landlord shall not be required to keep this security deposit separate from its general funds, and Tenant shall not be entitled to interest on such deposit. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, said deposit shall be credited to Tenant's monthly rental payment in the twelfth month following the date of Rent Commencement.  In the event of termination of Landlord's interest in this Lease, Landlord shall transfer said deposit to Landlord's successor in interest.

5. <u>Use</u>. The Premises shall be used and occupied for the operation of a franchised Chuck E. Cheese's Pizza Restaurant.  In the event of termination of the franchise agreement, the Premises may by used for other lawful use not inconsistent with the nature of the Premises.

a) <u>Compliance with Law</u>. Tenant shall, at Tenant's expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, and requirement in effect during the term or any part of the

term hereof regulating the use by Tenant of the Premises. Such responsibility of Tenant shall not extend to any required changes to the structure of the Premises.

b) <u>Condition of Premises</u>. Tenant hereby accepts the Premises in their condition existing as of the date of the possession hereunder, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Landlord warrants to Tenant that the Premises at the date hereof substantially complies with all applicable Federal, State, County and City laws, rules, ordinances and regulations, including environmental regulations.

c) <u>Right to Exclusivity</u>. Tenant shall have the exclusive right to sell pizza as a primary item and to maintain arcade games and any entertainment center equipment, including, but not limited to, any play structures, such as Soft Play™. Landlord shall consult with Tenant before allowing any adult-oriented retail concept. For purposes of this article 5, "adult" shall mean retail concepts designed to appeal to persons over the age of thirteen (13).

6.  <u>Maintenance, Repairs, and Alterations.</u>

a) <u>Landlord's Obligations</u>. Subject to the provisions of Section 6(a) above and Section 10, Landlord, at Landlord's expense, shall keep in good order, condition and repair the common areas, the foundations, exterior walls and the exterior roof of the Premises. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass.

b) <u>Tenant's Obligations</u>. Subject to the provisions of Article 6.(a) and Article 8, Tenant, at Tenant's expense, shall keep in good order, condition and repair the Premises and every part thereof including, without limiting the generality of the foregoing, all plumbing, heating, air conditioning, ventilating, electrical and lighting facilities and equipment within the Premises. Tenant's repair obligations shall not extend to the common areas including the parking lot, damage caused by fire, tornado, earthquake or flooding, nor damage caused by Landlord's failure to repair or maintain the foundation, structure or roof of the building.

c) <u>Surrender</u>. On the last day of the term hereof, or on any sooner termination, Tenant shall surrender the Premises to Landlord in good condition, broom clean, ordinary wear and tear excepted. Tenant shall repair any damage to the Premises occasioned by its use thereof, or by the removal of Tenant's trade fixtures, furnishings and equipment, which

repair shall include the patching and filling of holes and repair of structural damage.

d) <u>Landlord's Rights</u>. If Tenant fails to perform Tenant's obligations under this Article 6, Landlord may, at its option (but shall not be required to) enter upon the Premises, after ten (10) days prior written notice to Tenant or with no prior written notice if an emergency, and put the same in good order, condition and repair, and the cost thereof together with interest thereon at the rate of twelve percent (12%) per annum, shall become due and payable as additional rent to Landlord together with Tenant's next rental installment.

7. <u>Franchiser's Rights</u>. Landlord recognizes that Showbiz Pizza Time, Inc., the Franchiser, may, at its option (but shall not be required to) enter upon the Premises, with no prior written notice to the Tenant, in order to make any modifications necessary to protect Franchiser's Propriety Marks.

8. <u>Alterations and Additions</u>.

a) After the initial design and construction process, Tenant shall not, without Landlord's prior written consent, make any structural alterations, improvements, or additions in, on or about the Premises exceeding Ten Thousand Dollars ($10,000) in cost. Landlord shall not withhold consent to any reasonable alterations, additions and improvements, provided such improvements do not diminish the value of the Premises or any of the surrounding properties or common areas owned by the Landlord.

b) Before commencing any work relating to alterations, additions and improvements (except for non-structural improvements) affecting the Premises (none of which are required or requested by Landlord, nor any obligation of Tenant under this Lease), Tenant shall notify Landlord in writing of the expected date of commencement thereof. Landlord shall then have the right at any time and from time to time to post and maintain on the Premises such notices as Landlord reasonably deems necessary to protect the Premises and Landlord from mechanics liens, materialmen, liens, or any other liens. In any event, Tenant shall pay, when due, all claims for labor or materials furnished to or for Tenant or for use in the Premises. Tenant shall not permit any mechanics' or materialmen's liens to be levied against the Premises for any labor or material furnished to Tenant or claimed to have been furnished to Tenant or to Tenant's agents or contractors in connection with work of any character performed or claimed to have been performed on the Premises by or at the direction of Tenant.

c) All alterations, improvements, or additions which may be made on the Premises shall become the property of the Landlord and remain upon

and be surrendered with the Premises at the expiration of the term. Notwithstanding Tenant's machinery, equipment and trade fixtures, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises, shall remain the property of Tenant and may be removed by Tenant.

9.   Insurance Indemnity.

a)   Insuring Party.  As used herein, the term "insuring party" shall mean the party who has the obligation to obtain the insurance required hereunder. The insuring party in this case shall be the Tenant for Tenant Liability Insurance and the Landlord for Building insurance.   Whether the insuring party is Landlord or Tenant, Tenant shall, as additional rent, for the Premises, pay the actual cost of all insurance required hereunder. If Landlord is the insuring party Tenant shall, within ten (10) days following demand of Landlord, reimburse Landlord for the insurance so obtained plus any increases in insurance rates on entire building and contents attributable to Tenant's use.

b)   Liability Insurance.  Tenant shall obtain and keep in force during the term of this Lease a policy of comprehensive public liability insurance insuring Landlord and Tenant against all liability arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be in an amount of not less than one million dollars ($1,000,000) for injury or death of any person or property damage in any one accident or occurrence arising from Tenant's use of Premises.   The limits of said insurance shall not, however, limit the liability of Tenant hereunder.  Said insurance shall have a Landlord's Protective Liability endorsement attached hereto.  No policy shall be subject to reduction of coverage, nor cancelable without notice to and consent of the Landlord, which shall not be unreasonably withheld.  All such policies shall be written as primary policies not contributing with and not in excess of coverage which Landlord may carry.  Such insurance policies shall have Landlord as an additional insured.  Tenant will supply landlord with a current Certificate of Insurance showing Landlord as additional insured before occupancy and at least 10 days before expiration of any prior certificate.  In Tenant shall fail to procure and maintain said insurance Landlord may, but shall not be required to, procure and maintain the same, but at the expense of the Tenant.

c)   Property Insurance.  Landlord shall obtain and keep in force during the term of this Lease a policy or policies of insurance covering loss or damage to the Premises, in the amount of the full replacement value thereof to code required by any governmental agency, providing protection against all perils including within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils

(all risk) and sprinkler leakage. In addition thereto, Landlord shall maintain (i) full coverage plate glass insurance on the Premises, (ii) air conditioning equipment located in, on, or about the Premises with limits of not less than one hundred thousand dollars ($100,000) per occurrence and (iii) rent loss insurance in favor of Landlord insuring Landlord against any loss of rental from damage or destruction of the Premises for a period of at least six (6) months from the date of such damage or destruction. Said insurance shall provide for payment for loss thereunder to Landlord or to the holder(s) of a mortgage or deed of trust on the Premises.

d)   <u>Insurance Policies</u>. Insurance required hereunder shall be in companies rated A1, AAA, or better in "Best Insurance Guide." The insuring party shall deliver prior to possession, to the other party, copies of policies of such insurance or certificates evidencing the existence and amounts of such insurance with loss payable clauses satisfactory to Landlord. If Landlord is the insuring party, and if the insurance policies maintained hereunder cover other improvements in addition to the Premises, Landlord shall deliver to Tenant a written statement setting forth the amount of any such cost increase and showing in reasonable detail the manner in which it has been computed (i.e., leasehold improvements, use, proportionate share, etc.)

e)   <u>Waiver of Subrogation</u>. Unless prohibited by the respective insurers, Tenant and Landlord each waive any and all rights of recovery against the other, or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control, where such loss or damage is fully insured against under any insurance policy in force at the time of such loss or damage. Tenant and Landlord shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carriers that the foregoing mutual waiver of subrogation is contained in this Lease. Alternatively, both parties will have the other party named as an insured on the respective insurance policy.

10.   <u>Damage or Destruction</u>.

a)   <u>Partial Damage-Insured</u>. If the Premises are damaged and such damage was caused by a casualty covered under an insurance policy required to be maintained pursuant to this Lease, Landlord shall, at Landlord's expense, repair such damage as soon as reasonably possible, and this Lease shall continue in full force and effect.

b)   <u>Damage - Uninsured</u>. In the event the Premises may be damaged or destroyed by a casualty which is not covered by fire and extended coverage insurance carried by Landlord, the Landlord shall restore same, provided that if the uninsured damage or destruction is to an extent

—8—

greater than ten percent (10%) of the then replacement cost to code of the Premises (exclusive of Tenant's trade fixtures and equipment and exclusive of foundations) then Landlord may elect not to restore and to terminate this Lease. Landlord must give Tenant written notice of its election not to restore within thirty (30) days from the date Landlord received notice of such damage and, if not given, Landlord shall be deemed to have elected to restore and in such event shall repair any damage as soon as reasonably possible. In the event Landlord elects to give such notice of Landlord's intention to cancel and terminate this Lease, Tenant shall have the right within ten (10) days after receipt of such notice to give written notice to Landlord of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from Landlord, in which event this Lease shall continue in full force and effect and Tenant shall proceed to make such repairs as soon as reasonably possible. If Tenant does not give such notice within such ten (10) day period, Landlord shall pay Tenant an amount equal to the depreciated value of improvements to the Premises installed by Tenant at Tenant's expense and with Landlord's approval, and this Lease shall be canceled and terminated as of the date of the occurrence of such damage.

Notwithstanding anything to the contrary contained in this article, Landlord shall not have any obligation whatsoever to repair, reconstruct or restore the Premises when the damage resulting from any casualty covered under this article occurs during the last 12 months of the term of this Lease or any extension thereof.

c)   <u>Total Destruction</u>. If at any time during the term hereof the Premises are totally destroyed from any cause whether or not covered by the insurance required to be maintained by the insuring party pursuant to this Lease (including total destruction required by any authorized public authority), this Lease shall automatically terminate as of the date of such total destruction.

11.   <u>Abatement of Rent</u>.

a)   If the Premises are partially destroyed or damaged and Landlord or Tenant repairs or restores them pursuant to the provisions of this Lease, the rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Tenant's reasonable use of the Premises is substantially impaired. If the damage is due to the fault or neglect of Tenant or its employees, there shall be no abatement of rent.

b)   If Landlord shall be obligated to repair or restore the Premises under the provisions of this Lease and shall not commence such repair or

restoration within thirty (30) days after such obligations shall accrue, Tenant may, at Tenant's option, cancel and terminate this Lease by giving Landlord written notice of Tenant's election to do so at any time prior to the commencement of such repair or restoration. In such event, this Lease shall terminate as of the date of such notice. Any abatement in rent shall be computed as provided above.

12.   Real Property Taxes.

a)   Payment of Taxes. Tenant shall pay to Landlord all real property taxes, as additional rent, applicable to the Premises during the term of this Lease. All such payments shall be made at least ten (10) days prior to the delinquency date of such payment. If any such taxes shall cover any period of the time prior to or after expiration of the term hereof, Tenant's share of such taxes shall be equitably prorated to cover only the period of time within the tax fiscal year during which this Lease shall be in effect.

b)   Definition of "Real Property Taxes". As used herein, the term "real property tax" shall include any form of assessment, license fee, tax on rent, levy, penalty, or tax (other than inheritance or estate taxes) imposed by any authority having the direct or indirect power to tax, including city, county, state or federal government, or any school, agricultural, lighting, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Premises or in the real property of which the Premises are a part, against Landlord's right to rent or other income therefrom, or as against Landlord's business of leasing the Premises.

c)   Joint Assessment. If the Premises are not separately assessed, Tenant's liability shall be an equitable proportion of the real property taxes for all of the land and improvements included within the tax parcel assessed, as determined from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Tenant's portion of any such assessments shall be assumed to be approximately 50%, per Section 2, above.

13.   Personal Property Taxes.

a)   Tenant shall pay prior to delinquency all taxes assessed against and levied upon leasehold improvements, fixtures, furnishings, equipment and all other personal property of Tenant contained in the Premises or elsewhere. Tenant shall cause said leasehold improvements, trade fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord.

b)   If any of Tenant's personal property shall be assessed with Landlord's real property, Tenant shall pay Landlord the taxes attributable to Tenant within ten (10) days after receipt of a written statement, determined reasonably and in good faith, setting forth the taxes applicable to Tenant's property.

14.   Common Areas.

a)   Definitions. The phrase "Common Areas" means all areas and facilities outside the Premises that are provided and designated for general use and convenience of Tenant and other tenants and their respective officers, agents, and employees, customers and invitees. Common Areas include (but are not limited to) pedestrian sidewalks, landscaped areas, roadways, and parking areas.

b)   Maintenance. During the term of this Lease, Landlord shall operate, manage and maintain the Commons Areas so that they are clean and free from accumulation of debris, filth, rubbish and garbage.

c)   Tenant's Use of Common Areas. Landlord hereby grants to Tenant, during the term of this Lease, the license to use, for the benefit of Tenant and its officers, agents, employees, customers, and invitees, in common with the others entitled to such use, the Common Areas as they from time to time exist, subject to the rights, powers, and privileges herein reserved to Landlord. Storage, either permanent or temporary, of any materials, supplies or equipment in the Common Areas is strictly prohibited. Should Tenant violate this provision of the Lease, then in such event, Landlord may, without notice to Tenant, remove said materials, supplies or equipment from the Common Areas and place such items in storage, the cost thereof to be reimbursed by Tenant within ten (10) days from receipt of a statement submitted by Landlord. All subsequent costs in connection with the storage of said items shall be paid to Landlord by Tenant as accrued. Failure of Tenant to pay these charges within ten (10) days from receipt of statement shall constitute a breach of this Lease. Tenant and its officers, agents, employees, customers and invitees shall park their motor vehicles only in areas as designated from time to time by Landlord for that purpose. Tenant shall not at any time park or permit the parking of motor vehicles, belonging to it or to others, so as to interfere with the pedestrian sidewalks, roadways and landing areas. Tenant acknowledges receipt of and review of the "Declaration" dated July 21, 1971 controlling the common parking areas and ratio of parking to retail space. Tenant agrees that receiving and shipping goods and merchandise and all removal of refuse shall be made only by way of the loading areas constituting part of the Premises. Tenant shall repair, at its cost, all deterioration or damages to the Common Areas occasioned by its lack of ordinary care.

-11-

d)     <u>Expenses and Prorations</u>.  Tenant shall pay to Landlord upon demand, as additional rent, 50% of any landscaping maintenance charges, parking lot sweeping charges and any other unsegregated expense obligations of Tenant called for in this Lease Agreement.

e)     <u>Utilities</u>.  Tenant shall pay for all water, gas, heat, light, power, telephone and other utilities and services supplied to the Premises, together with any taxes thereon.  If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion of all charges jointly metered with other premises.

15.     <u>Assignment and Subletting</u>.

a)     Tenant shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises without Landlord's prior written consent, which Landlord shall not unreasonably withheld. As long as the Franchise agreement is in effect, tenant may not sublease or assign the Lease to a party other than Franchiser or its assigns. Landlord shall immediately provide notice to Franchiser in the event Tenant seeks to assign, transfer, mortgage, sublet or otherwise transfer or encumber all or any part of the Tenant's interest in this Lease or in the Premises prior to Landlord's written consent.  A consent to one assignment, subletting, occupation or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person.  Consent to any such assignment or subletting shall in no way release Tenant from any liability under this Lease. Any attempted assignment, transfer, mortgage, encumbrance, or subletting without consent shall be void and shall constitute a breach of this Lease.

b)     In the event that Landlord shall consent to a sublease or assignment hereunder, Tenant shall pay Landlord reasonable fees not to exceed Two Hundred Dollars ($200.00), incurred in connection with the processing of documents necessary to giving of such consent.

c)     <u>Assignment by Landlord</u>.  Landlord shall be permitted freely to assign all of its rights hereunder.  Tenant hereby agrees to acquiesce to any assignment of Landlord's rights hereunder, whether such assignment is voluntary or by operation of law.

16.     <u>Defaults; Remedies</u>.

a)     <u>Defaults</u>.  The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant.

-12-

i)      The abandonment of the Premises by Tenant.

ii)     The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder, as and when due where such failure shall continue for a period of seven (7) days after written notice hereof from Landlord to Tenant.

iii)    The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than described in Paragraph (b) above, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default of Tenant commenced such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

iv)     The filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within ninety (90) days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within sixty (60) days, or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged within sixty (60) days.

b)  <u>Remedies in Default</u>.  In the event of any material default or breach by Tenant, Landlord may at any time thereafter, with such notice as required by law and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default or breach; Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including but not limited to

i)      the cost of recovering possession of the Premises; and

ii)     expenses of re-letting, including necessary renovation and alteration of the Premises; and

iii)   reasonable attorneys' fees; and

iv)   the worth at the time of award determined by the arbitration service or by the court having jurisdiction thereof, of the unpaid rent that had been earned at the time of termination of this Lease; and

v)   any other amount, and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default.  Unpaid installments of rent or other sums shall bear interest from the date due at the rate of prime rate plus one and one half percent (1-1/2%).

c)   <u>Franchiser's Right to Assume on Franchisee's Default</u>.  Upon Franchisee's default under the Lease or the Franchise agreement, the Franchiser, ShowBiz Pizza Time, Inc. or its assigns, shall have the right without the obligation to assume the Lease for the Premises and/or to sublease to a new Franchisee on behalf of the Franchisee subject to the terms of the Article 15.

d)   <u>Default by Landlord</u>.  The occurrence of the following events shall constitute a default and breach of this Lease by Landlord.

Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord and to the holder of any first mortgage or deed of trust covering the Premises, where name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation.  If the nature of the Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.

e)   <u>Late Charges</u>.  Tenant hereby acknowledges that late payment by Tenant to Landlord of rent and other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include but are not limited to, processing and accounting charges, and late charges which may be imposed on Landlord by the term of any mortgage or trust deed covering the Premises.  Accordingly, if any installment of rent or any other sum due from Tenant shall not be submitted to Landlord or Landlord's designee within ten (10) days after that said amount is due, then Tenant shall pay to Landlord a late charge of five percent (5%) of such overdue amount, with interest of twelve percent (12%) per annum accruing on the unpaid rent, plus the late charge, until both are paid.  In no event shall any late charge be

required in violation of any law. The parties agree that such late charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other remedies granted hereunder.

f)  <u>Cure by Landlord</u>. Landlord or Franchiser, at any time after Tenant commits a default, may cure the default at Tenant's cost. If Landlord or Franchiser at any time, by reason of Tenant's default, pays any sum or does any act that requires the payment of any sum, the sum paid shall be due immediately from Tenant to the paying party, and if paid at a later date shall be interest at the rate of the prime rate plus one and one half percent (1-1/2%) from the date the sum is paid until the paying party is reimbursed by Tenant. The sum, together with interest shall be deemed additional rent hereunder.

17.  <u>Condemnation</u>. If the Premises or any portion thereof exceeding twenty-five percent (25%) are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of said power (all of which is herein referred to as "condemnation"), either Landlord or Tenant may terminate this Lease as of the date the condemning authority takes possession by notice in writing of such election within twenty (20) days after Landlord shall have notified Tenant of the taking, or in the absence of such notice, then within twenty (20) days after the condemning authority shall have taken possession.

If this Lease is not terminated by either Landlord or Tenant then it shall remain in full force and effect as to the portion of the Premises remaining, provided the rental shall be reduced in proportion to the floor area taken within the Premises as bears to the total floor area of the Premises. In the event this Lease is not so terminated, then Landlord agrees, at Landlord's sole cost, as soon as reasonably possible, to restore the Premises to a complete unit of like quality and character as existed prior to the condemnation. All awards for the taking of any part of the Premises or any payment made under the threat of the exercise of power of eminent domain shall be the property of Landlord, whether made as compensation for diminution of value of the leasehold or for the taking of the fee or as severance damages; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures and removable personal property.

18.  <u>General Provisions</u>.

a)  <u>Estoppel Certificate</u>.

Tenant, shall, at any time, upon not less than ten (10) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord a statement in writing (i) certifying that this Lease is unmodified and in

-15-

full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent, security deposit, and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults, if any, which are claimed.  Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.

b)   Severability.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

c)   Time of Essence.  Time is of the essence.

d)   Captions.  Article and paragraph captions are not a part hereof.

e)   Incorporation of Prior Agreement; Amendments.  This Lease contains all agreements of the parties with respect to any matter mentioned herein.  No prior agreement or understanding pertaining to any such matter shall be effective.  This Lease may be modified in writing only, signed by the parties in interest at the time of the modification.  Provided, however, that Landlord and Tenant shall notify Franchiser of any modifications before they occur.

f)   Waivers.  No waiver by Landlord of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision.  Landlord's consent to or approval of any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by the Tenant.  The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant or any provision hereof, other than the failure of Tenant to pay the particular rent so accepted regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent.

g)   Recording.  Tenant shall not record this Lease without Landlord's prior written consent, and such recordation shall, at the option of Landlord, constitute a noncurable default of Tenant hereunder.  Either party shall, upon request of the other, execute, acknowledge and deliver to the other a "short form" memorandum of the Lease for recording purposes.

h)   Holding Over.  If Tenant remains in possession of the Premises or any party thereof after the expiration of the term hereon without the express written consent of Landlord, such occupancy shall be a tenancy from month to month at a rental in the amount of one hundred ten percent (110%) of the last monthly rental plus all other charges payable

hereunder, and upon the terms hereof applicable to month to month tenancy.

i)    Binding Effect; Choice of Law; prorations.   Subject to any provisions hereof restricting assignment or subletting by Tenant and subject to the provision of Article 13.2, this Lease shall bind the parties, their personal representatives, successors and assigns. This Lease shall be governed by the laws of the state of Washington. All prorations shall be on the basis of a thirty (30) day month.

j)    Subordination; Right to Quiet Possession.   This Lease, at Landlord's option, shall be subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation for security now or hereafter placed on the real property of which the Premises are a part and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding such subordination, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. If any mortgage, trustee or ground lessor shall elect to have this Lease prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Tenant, this Lease shall be deemed prior to such mortgage, deed of trust, or ground lease, whether this Lease is dated prior or subsequent to the date of said mortgage, deed of trust or ground lease, or the date of recording thereof.

Tenant agrees to execute any documents required to effectuate such subordination or to make this Lease prior to the lien of any mortgage, deed of trust or ground lease, as the case may be, and failing to do so within twenty (20) days after written demand, does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead, to do so.

k)    Arbitration and Attorney's Fees.   Instead of going to court, in the event a dispute shall arise between the parties to this Lease, it is hereby agreed that the dispute shall be referred to the Seattle office of the Washington Arbitration Services for arbitration in accordance with the Rules of Washington Arbitration Services. The arbitrator's decision shall be final and binding and judgment may be entered thereon. The prevailing party is entitled to reasonable attorney fees and all costs incurred in preparation for and conduct of the arbitration. In the event a party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other party is entitled to costs of suit including a reasonable attorney's fee for having to compel arbitration or defend or enforce any of the

rights, agreements, covenants, or conditions herein contained, the losing party in such action shall pay to the prevailing party all expenses incurred therefore, including reasonable attorney's fees to be fixed by the arbitrator or the court in such action.

l)   Landlord's Access.  Landlord and Landlord's agents shall have the right to enter the Premises at reasonable times outside of business hours for purpose of inspecting the same, showing the same to prospective purchasers, tenants, or lenders, and making such alterations, repairs, improvements or additions to the Premises or to the building of which they are a part as Landlord may deem necessary or desirable.  Landlord may at any time place on or about the Premises any ordinary signs all without rebate of rent or liability to Tenant.

m)   Corporate Authority.  Each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of Seattle Entertainment Concepts, Inc.,  in accordance with a duly adopted resolution of the Board of Directors of said company or in accordance with the bylaws of said company, and that this Lease is binding upon said company in accordance with its terms.

n)   Signs.  All signs or symbols placed in the windows or doors or elsewhere about the Premises or upon any exterior part of the building by the Tenant shall be subject to the reasonable approval of the Landlord or Landlord's agents.   Tenant will remove such signs or symbols at the termination of the tenancy herein created and repair any damage or injury to the Premises caused thereby, and if not so removed by Tenant then Landlord may have same removed at Tenant's expense.  Landlord agrees to place a sign identifying all occupants of the building at or near the driveway entrance.   Any other signs or symbols placed in the windows or doors or elsewhere about the Premises or upon any exterior part of the building by the Tenant shall be restricted to 50% of the occupancy for each tenant of all signage allowed by the city (or any authorized governmental agency) for the entire building.

o)   Notices.  Wherever under this Lease provision is made for any demand, notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other parties, it shall be in writing and served either personally or sent by United States mail, postage prepaid, addressed to the addresses set forth hereinbelow:

To Landlord:                    To Tenant:
DDF&S                           Seattle Entertainment Concepts, Inc.
8600 Lake City Way N.E.   4445 S.W. 10th Ave.
Seattle, WA 98115             Beaverton, OR 97005

To Franchiser:
Showbiz Pizza Time
Attn:  Director of Franchise
4441 W. Airport Fwy.
Irving, TX  75062

or to such other place as either party may direct in writing.

19.     Tenant Improvements.  Tenant accepts Premises in its present condition.  All
tenant improvements will be constructed by tenant according to all applicable
governmental regulations.

TENANT:  Seattle Entertainment Concepts, Inc.


Date: _Sept 9, 1995_          By: _____
                                   Tom J. Maginnis


LANDLORD:  DDF&S


Date: _9-8-95_          By: _____


Date: _____          By: _____


STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF KING               )

On this _____ day of _____, 1995, before me personally appeared
TOM  J.  MAGINNIS,  to  me  known  to  be  the  _____  of
_____, who executed the within and foregoing instrument, and
acknowledged said instrument to be the free and voluntary act and deed of said
corporation, for the uses and purposes therein mentioned, and on oath stated that
_____ authorized to execute said instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official
seal the day and year first above written.


_____
_____(Print Name)
Notary Public in and for the State of
Washington, residing at _____
My Commission Expires: _____

-19-

STATE OF WASHINGTON        )
                                 ) ss.

COUNTY OF KING              )

      On this _9th_ day of _September_, 1995, before me personally appeared _Frank Colacurcio Jr_, to me known to be the _person_ of _reference_, who executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that _he_ authorized to execute said instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_Jennifer J Reiber_
_____ (Print Name)
Notary Public in and for the State
of Washington, residing at _Seattle_
My Commission Expires: _3-1-96_

STATE OF WASHINGTON        )
                                 ) ss.

COUNTY OF KING              )

      On this _____ day of _____, 1995, before me personally appeared _____, to me known to be the _____ of _____, who executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that _____ authorized to execute said instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

_____
_____ (Print Name)
Notary Public in and for the State
of Washington, residing at _____
My Commission Expires: _____

–20–

# *EXHIBIT 2*



# Bloodworth Carroll, P.C.

10000 North Central Expressway
Suite 1050
Dallas, Texas  75231

**LAURIE A. CARROLL**
*direct* 214.234.2723 *fax* 214.234.2727
carroll@bcrelaw.com

August 18, 2015

DSL Overlake LLC
P.O. Box 75568
Seattle, Washington  98175

DSL Overlake LLC                                            *Via Federal Express*
8600 Lake City Way NE
Seattle, Washington  98115

Re:   Lease (the "Lease") dated August 30, 1995, executed by and between DDF&S,
      predecessor-in-interest to DSL Overlake LLC ("Landlord") and Seattle
      Entertainment Concepts, Inc., predecessor-in-interest to CEC Entertainment, Inc.
      ("Tenant") covering certain leased premises (the "Premises") located at 2239
      148th Avenue NE, Bellevue, Washington (Chuck E. Cheese's #305)

Dear Sirs:

In connection with the above referenced matter, I represent Landlord. As you are aware,
pursuant to the letter from Tenant to Landlord dated March 2, 2015 (a copy of which is enclosed
with this letter), Tenant validly exercised its second option to renew the term of the Lease for an
additional period of five (5) years in accordance with Section 3(c) of the Lease. The renewal
term begins on September 1, 2015. However, at this point, a Prevailing Market Rate (as defined
in the Lease) has not been determined.

Therefore, pursuant to Section 3(c) of the Lease, Tenant shall begin paying rent equal to
$21.45 per square foot per annum, which equals 110% of the amount of rent currently in effect
(which is $19.50 per square foot per annum).

Based upon a letter from T. Jeffrey Keane to Doug Plager dated August 8, 2015, which
was forwarded to Tenant by Mr. Plager, I understand that there may be some confusion as to the
amount of rent currently due from Tenant under the Lease. Enclosed please find a letter from
Landlord to Tenant dated September 19, 2010 setting the rent for the first renewal term at $19.50
per square foot beginning September 1, 2010. This is the amount that Tenant has been paying to
Landlord for the last five years of the term of the Lease. Please note that paragraph 4(b) of the
Lease did provide for CPI escalations though the fifteen-year primary term; however, that
provision expired by its own terms and was not included as part of the rent due for the first
renewal term pursuant to Landlord's September 19, 2010 letter.

# Bloodworth Carroll, P.C.

DSL Overlake LLC
August 18, 2015
Page 2


Should you have any questions concerning this matter, please do not hesitate to call.

Sincerely,

Laurie A. Carroll

LAC/nh
Encl.

cc:    T. Jeffrey Keane, Esq.                    **Via Email**: tjk@jkeanelaw.com
       Keane Law Offices
       100 NE Northlake Way, Suite 200
       Seattle, Washington  98105

       Mr. Doug Plager                           **Via Email**:  dplager@wallaceproperties.com
       Wallace Properties
       330-112th Avenue NE, Suite 200
       Bellevue, Washington  98004

       Mr. Mark Hullinger                                        **Via Email**
       Lisa Blackburn, Esq.                                     **Via Email**
       Ms. Tamela Kelley                                        **Via Email**

#305

**DDF&S INVESTMENTS**
PO BOX 75568
SEATTLE, WA 98175
(206) 524-0116
FAX (206) 524-3511

September 19, 2010

SENT BY FAX:  972.258.5534

Mr. Les Lehner
CEC
4441 W. Airport Frwy
Irving, Texas 75062

Re: Chuck E Cheese's #305
     2239 148th Avenue NE
     Bellevue, WA 98007

Mr. Les Lehner:

Per our recent negotiations the new rental rate for your above location will be $19.50 per square foot.  This rate is effective September 1, 2010.

Please adjust rent paid for September.  Thank you.

Sincerely,

David Ebert
Director



**Mark Hullinger**
**Senior Director, Real Estate**
**Phone:  972/258-5423**
**Fax #:   972/258-5498**

March 2, 2015

USPS Overnight EK 4996670733 US

DSL Overlake LLC
P.O. Box 75568
Seattle, WA 98175

CC: DSL Overlake LLC
8600 Lake City Way NE
Seattle, WA 98115

RE:   Chuck E. Cheese's #305
      2239 148th Ave NE
      Bellevue, WA 98007

Dear Sirs,

Be advised that pursuant to that certain Lease dated August 30, 1995 between DSL Overlake LLC, ("Landlord") and Seattle Entertainment Concepts, Inc., predecessor in interest to CEC Entertainment, Inc., ("Tenant"), Tenant hereby exercises its right to renew the Lease for a period of five (5) years commencing on September 1, 2015 at "Prevailing Rental Rate", as defined in the lease.

Sincerely,

Mark Hullinger

Page 1 of 1



**XH BFIA**

TRK# 7743 1080 7350
0201

WED - 19 AUG AA
STANDARD OVERNIGHT

98115
WA-US        SEA

ORIGIN ID:TRLA        (214) 234-2723
LACHIE CARROLL PC
BLOOM &DEROLL
18700 NORTH CENTRAL EXPRESSWAY
SUITE 1650
DALLAS, TX 75231
UNITED STATES US

TO  DSL OVERLAKE LLC

8600 LAKE CITY WAY NE

(214) 234-2720
INV:
PO:                        DEPT:

SEATTLE WA 98115
REF: 2000.005

SHIP DATE: 18AUG15
ACTWGT: 1.00 LB
CAD: 3951618/NET3670

BILL SENDER

FedEx Express

539J1/FECA/31D0

---

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# *EXHIBIT 3*



**CEC Entertainment**
1707 Market Pl Blvd Suite 200, Irving, TX 75063
phone 972.258.5459:: fax 214-496-9635
tommy.tsang@cecentertainment.com

<u>**NOTICE OF TENANT'S EXERCISE OF THIRD OPTION**</u>
<u>**(CEC #305 – 2239 148ᵗʰ Av. NE, BELLEVUE, WA CHUCK E CHEESE)**</u>

VIA USPS CMRRR **7019 0700 0002 2804 6231**

**March 5, 2020**

DSL Overlake, LLC
11012 Canyon Road E.
c/o Rivers Edge Properties
Suite 8-943
Puyallup, WA 98373
253-208-0733

Re:  the Lease Agreement, dated August 30, 1995, (as amended and modified, the "**Lease**"), by and between DSL Overlake, LLC, successor in interest to DDF&S ("**Landlord**"), and CEC Entertainment, Inc., successor in interest to Seattle Entertainment Concepts, Inc.  ("**Tenant**"), concerning the Premises, as further defined in the Lease, being approximately 10,885 square feet in the City of Bellevue, County of King, State of Washington

Dear Landlord:

Be advised that pursuant to the Lease, Tenant hereby exercises its right to renew the Lease for a period of five (5) years commencing on **Tuesday, September 1, 2020**.

Tenant hereby accepts Landlord's Prevailing Rental Rate (as defined in the Lease) as offered in an email to Mr. Tony Bowen on February 10, 2020 at the monthly rental rate of **$24,944.79** for the entire option term (being $27.50 per square foot on an annualized basis).

Please let me know if you have any questions and Tenant looks forward to continuing its relationship with Landlord.

Sincerely,

Thomas "Tommy" Tsang
Counsel for Tenant


cc (via email):   Vernell Mobley
Tony Bowen
Shelley Hartman
Flor Rodriguez

# *EXHIBIT 4*

**MARTIN BURNS**
Attorney at Law
cell: (253) 405-7634
martin@mburnslaw.com

# BURNS LAW, PLLC
524 Tacoma Ave. S.
Tacoma, WA 98402
ph: (253) 507-5586
fax: (253) 507-5713

**MINDIE L. FLEMINS**
Attorney at Law
mindie@mburnslaw.com

**RYAN MOORE**
Attorney at Law
ryan@mburnslaw.com

**RECEIVED**

July 22, 2020

JUL 3 0 2020

**SENT VIA REGULAR & CERTIFIED MAIL**

CEC Entertainment, Inc.
1707 Market Place Blvd., Suite 200
Irving, Texas 75063

Dear Sir or Madam:

I am the attorney for the landlord.  The 7/15/2020 proposal is rejected.  DSL Overlake, LLC is not willing to vary the forward rents beyond what was set forth in the recent amendment to lease that was, in large part drafted by CEC.  The landlord is willing to be flexible as to the arrearages but only if the forward rents are agreed as set forth in such recently signed and transmitted Amendment to lease.

Absent that, it is noted that the lease runs out August 31, 2020 and given the breaches, the last of the extension may not be exercised, per the Lease Section 3.c.  While bankruptcy decisions give the bankruptcy court discretion of allowing a debtor to exercise extensions in spite of prepetition defaults, I am unaware of a court allowing this and (1) mandating reduced rent and (2) not taking into account the landlord's right to the benefit of the lease which include being fully paid and the lease be assumed.  Also, post-petition defaults are problematic in such analysis.  While the landlord remains will to work with CEC within the confines of the bankruptcy law, the July 25, 2020 proposal goes well beyond the relief a bankruptcy court could order and well beyond what the Landlord is willing to bear.  Until there is a fully executed lease amendment/extension, we ask that CEC plan accordingly to return possession at the end of the lease term.

Sincerely,

BURNS LAW, PLLC

**Martin Burns**
**Attorney at Law**

MB/sf

M:\31000\31032 DSL Overlake, LLC (Fueston)\Corr\Ltr to CEC 072220.doc

# *EXHIBIT 5*

**MARTIN BURNS**
Attorney at Law
cell: (253) 405-7634
martin@mburnslaw.com

# BURNS LAW, PLLC
524 Tacoma Ave. S.
Tacoma, WA 98402
ph: (253) 507-5586
fax: (253) 507-5713

**MINDIE L. FLEMINS**
Attorney at Law
mindie@mburnslaw.com

**RYAN MOORE**
Attorney at Law
ryan@mburnslaw.com

August 11, 2020

**SENT VIA REGULAR, CERTIFIED & EMAIL**

CEC Entertainment, Inc.
Attn: Colton Pearson                    *(cpearson@cecentertainment.com)*
1707 Market Place Blvd., Suite 200
Irving, Texas 75063

Dear Mr. Colton:

I am in receipt of your August 3, 2020 letter. I am responding to the issues raised.

First, as to the bankruptcy, if there are any limitation on a landlord's ability to rely upon the lease agreement as written, please provide such order.

Second, as to the Governor's proclamation you reference – it does not deal with commercial. Please review it, it deals only with "dwellings". A copy of the proclamation is attached.

Third, my client signed a lease extension with minor modifications that CEC provided in June 2020. DSL Overlake, LLC is still willing to honor such agreement as written. Understand, CEC drafted the extension and we did not change the rent amounts.

Fourth, the lease runs out at the end of the month. DSL Overlake is not intending to negotiate further than the previously provided lease extension that was provided. If CEC is not willing to sign such extension, it needs to comply with the lease and vacate as required.

Fifth, I understand your position that you claim to have extended the lease. Regardless of such position, CEC has breached the lease presently. Moreover, it is one of only a few buildings of such size. The $27.50 per square feet is conservative at this point and there is significant interest expressed in this location as DSL Overlake has been forced to consider re-letting the premises given CEC's difficulties. The point being, the "prevailing rental rate" referenced in the lease is now in excess of the $27.50 offered.

Sixth, DSL Overlake is intending to honor its obligations. It has worked in good faith with CEC which, despite having agreed in principle as to the extension rental rate, then tried to change such arrangement. CEC has had several different people working this account which has resulted in changing and inconsistent position.

CEC Entertainment, LLC
August 11, 2020
Page 2

If CEC wants to continue to lease this premises then it needs to execute the proffered extension, pay the back due rents in the amounts of $60,656.14 for the two months (April and May 2020 and past due triple nets) and the that were agreed on in the extension and continue to remain in compliance with the lease and the proffered extension thereafter. They are still willing to defer June, July and August 2020 rent as in the lease extension.

Seventh, recently a new invoice was sent that set forth further triple charges outstanding. Those need to be paid in addition to the $6,656.14 above.

Absent a positive response, I will be referring my client to a bankruptcy attorney to review the filings in this case and to thereafter take appropriate action in compliance with any obligations/restrictions imposed by the filing of the bankruptcy.

Sincerely,

BURNS LAW, PLLC

Martin Burns
Attorney at Law

MB/sf

cc: Tommy Tsang tommy.tsang@cecentertainment.com

M:\31000\31032 DSL Overlake, LLC (Fueston)\Corr\Ltr to CEC 081120.doc



JAY INSLEE
Governor

STATE OF WASHINGTON

OFFICE OF THE GOVERNOR

P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov

**PROCLAMATION BY THE GOVERNOR**
**EXTENDING AND AMENDING 20-05, 20-19, and 20-19.1**

**20-19.2**

**Evictions and Related Housing Practices**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06 through 20-53 and 20-55 through 20-57, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, continues to broadly spread throughout Washington State; and

**WHEREAS,** the COVID-19 pandemic is causing a sustained global economic slowdown, and an economic downturn throughout Washington State with unprecedented numbers of layoffs and reduced work hours for a significant percentage of our workforce due to substantial reductions in business activity impacting our commercial sectors that support our state's economic vitality, including severe impacts to the large number of small businesses that make Washington State's economy thrive; and

**WHEREAS,** many of our workforce expected to be impacted by these layoffs and substantially reduced work hours are anticipated to suffer economic hardship that will disproportionately affect low and moderate income workers resulting in lost wages and potentially the inability to pay for basic household expenses, including rent; and

**WHEREAS,** the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes, increasing the life, health and safety risks to a significant percentage of our people from the COVID-19 pandemic; and

**WHEREAS**, tenants, residents, and renters who are not materially affected by COVID-19 should and must continue to pay rent, to avoid unnecessary and avoidable economic hardship to landlords, property owners, and property managers who are economically impacted by the COVID-19 pandemic; and

**WHEREAS,** under RCW 59.12 (Unlawful Detainer), RCW 59.18 (Residential Landlord Tenant Act), and RCW 59.20 (Manufactured/Mobile Home Landlord-Tenant Act) residents seeking to avoid default judgment in eviction hearings need to appear in court in order to avoid losing substantial rights to assert defenses or access legal and economic assistance; and

**WHEREAS,** on May 28, 2020, in response to the COVID-19 pandemic, the Washington Supreme Court issued Amended Order No. 25700-B-625 and ordered that courts should begin to hear non-emergency civil matters. While appropriate and essential to the operation of our state justice system, the reopening of courts could lead to a wave of new eviction filings, hearings, and trials that risk overwhelming courts and resulting in a surge in eviction orders and corresponding housing loss statewide; and

**WHEREAS,** the Washington State Legislature has established a housing assistance program in RCW 43.185 pursuant to its findings in RCW 43.185.010 "that it is in the public interest to establish a continuously renewable resource known as the housing trust fund and housing assistance program to assist low and very low-income citizens in meeting their basic housing needs;" and

**WHEREAS,** it is critical to protect tenants and residents of traditional dwellings from homelessness, as well as those who have lawfully occupied or resided in less traditional dwelling situations for 14 days or more, whether or not documented in a lease, including but not limited to roommates who share a home; long-term care facilities; transient housing in hotels and motels; "Airbnbs"; motor homes; RVs; and camping areas; and

**WHEREAS,** a temporary moratorium on evictions and related actions throughout Washington State at this time will help reduce economic hardship and related life, health, and safety risks to those members of our workforce impacted by layoffs and substantially reduced work hours or who are otherwise unable to pay rent as a result of the COVID-19 pandemic; and

**WHEREAS,** a temporary moratorium on evictions and related actions will reduce housing instability, enable residents to stay in their homes unless conducting essential activities or employment in essential business services, and promote public health and safety by reducing the progression of COVID-19 in Washington State; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continues to threaten the life and health of our people as well as the economy of Washington State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS,** the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS,** the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Washington State Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people.

**NOW, THEREFORE,** I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05 and all amendments thereto remain in effect, and that Proclamations 20-05, 20-19, and 20-19.1 are amended to temporarily prohibit residential evictions and temporarily impose other related prohibitions statewide until 11:59 p.m. on August 1, 2020, as provided herein.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Washington State Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

**ACCORDINGLY,** based on the above noted situation and under the provisions of RCW 43.06.220(1)(h), and to help preserve and maintain life, health, property or the public peace, effective immediately and until 11:59 p.m. on August 1, 2020, I hereby prohibit the following activities related to residential dwellings and commercial rental properties in Washington State:

- Landlords, property owners, and property managers are prohibited from serving or enforcing, or threatening to serve or enforce, any notice requiring a resident to vacate any dwelling or parcel of land occupied as a dwelling, including but not limited to an eviction notice, notice to pay or vacate, notice of unlawful detainer, notice of termination of rental, or notice to comply or vacate. This prohibition applies to tenancies or other housing arrangements that have expired or that will expire during the effective period of this Proclamation. This prohibition applies unless the landlord, property owner, or property manager (a) attaches an affidavit attesting that the action is necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident; or (b) provides at least 60 days' written notice of intent to (i) personally occupy the premises as a primary residence, or (ii) sell the property.

- Landlords, property owners, and property managers are prohibited from seeking or enforcing, or threatening to seek or enforce, judicial eviction orders involving any dwelling or parcel of land occupied as a dwelling, unless the landlord, property owner, or property manager (a) attaches an affidavit attesting that the action is necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident; or (b) shows that at least 60 days' written notice were provided of intent to (i) personally occupy the premises as a primary residence, or (ii) sell the property.

- Local law enforcement are prohibited from serving, threatening to serve, or otherwise acting on eviction orders affecting any dwelling or parcel of land occupied as a dwelling, unless the

3

eviction order clearly states that it was issued based on a court's finding that (a) the individual(s) named in the eviction order is creating a significant and immediate risk to the health, safety, or property of others; or (b) at least 60 days' written notice were provided of intent to (i) personally occupy the premises as a primary residence, or (ii) sell the property.

- Landlords, property owners, and property managers are prohibited from assessing, or threatening to assess, late fees for the non-payment or late payment of rent or other charges related to a dwelling or parcel of land occupied as a dwelling, and where such non-payment or late payment occurred on or after February 29, 2020, the date when a State of Emergency was proclaimed in all counties in Washington State.

- Landlords, property owners, and property managers are prohibited from assessing, or threatening to assess, rent or other charges related to a dwelling or parcel of land occupied as a dwelling for any period during which the resident's access to, or occupancy of, such dwelling was prevented as a result of the COVID-19 outbreak.

- Except as provided in this paragraph, landlords, property owners, and property managers are prohibited from treating any unpaid rent or other charges related to a dwelling or parcel of land occupied as a dwelling as an enforceable debt or obligation that is owing or collectable, where such non-payment was as a result of the COVID-19 outbreak and occurred on or after February 29, 2020, and during the State of Emergency proclaimed in all counties in Washington State. This includes attempts to collect, or threats to collect, through a collection agency, by filing an unlawful detainer or other judicial action, withholding any portion of a security deposit, billing or invoicing, reporting to credit bureaus, or by any other means. **This prohibition does not apply to a landlord, property owner, or property manager who demonstrates by a preponderance of the evidence to a court that the resident was offered, and refused or failed to comply with, a re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident; failure to provide a reasonable re-payment plan shall be a defense to any lawsuit or other attempts to collect.**

- Landlords, property owners, and property managers are prohibited from increasing, or threatening to increase, the rate of rent for any dwelling, parcel of land occupied as a dwelling. Except as provided below, this prohibition also applies to commercial rental property if the commercial tenant has been materially impacted by the COVID-19, whether personally impacted and is unable to work or whether the business itself was deemed non-essential pursuant to Proclamation 20-25 or otherwise lost staff or customers due to the COVID-19 outbreak. This prohibition does not apply to commercial rental property if rent increases were included in an existing lease agreement that was executed prior to February 29, 2020 (pre-COVID-19 state of emergency).

- Landlords, property owners, and property managers are prohibited from retaliating against individuals for invoking their rights or protections under Proclamations 20-19, 20-19.1, 20-19.2, or any other state or federal law providing rights or protections for residential dwellings. Nothing in this order prevents a landlord from seeking to engage in reasonable communications with tenants to explore re-payment plans in accordance with this order.

Terminology used in these prohibitions shall be understood by reference to Washington law, including but not limited to RCW 49.60, RCW 59.12, RCW 59.18, and RCW 59.20. For purposes of this Proclamation, a "significant and immediate risk to the health, safety, or property of others created by the resident" (a) is one that is described with particularity, and cannot be established on the basis of the resident's own health condition or disability; (b) excludes the situation in which a resident who may have been exposed to, or contracted, the COVID-19, or is following Department of Health guidelines regarding isolation or quarantine; and (c) excludes circumstances that are not urgent in nature, such as conditions that were known or knowable to the landlord, property owner, or property manager pre-COVID-19 but regarding which that entity took no action.

**FURTHERMORE**, it is the intent of this order to prevent a potential new devastating impact of the COVID-19 outbreak – that is, a wave of statewide homelessness that will impact every community in our State. To that end, this order further acknowledges, applauds, and reflects gratitude to the immeasurable contribution to the health and well-being of our communities and families made by the landlords, property owners, and property managers subject to this order.

**ADDITIONALLY**, I want to thank the vast majority of tenants who have continued to pay what they can, as soon as they can, to help support the people and the system that are supporting them through this crisis. The intent of Proclamation 20-19, and all amendments and extensions thereto, is to provide relief to those individuals who have been impacted by the COVID-19 crisis. I strongly encourage landlords and tenants to communicate in good faith with one another, and to work together, on the timing and terms of payment and repayment solutions that all parties will need in order to overcome the severe challenges that COVID-19 has imposed for landlords and tenants alike.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5).

Signed and sealed with the official seal of the state of Washington on this 2nd day of June, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

_____/s/_____

Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

# *EXHIBIT 6*

| From: | Martin Burns |
|---|---|
| To: | Genender, Paul |
| Cc: | Bowling, Scott; Pennington Prugh, Amanda; Rutherford, Jake |
| Subject: | RE: CEC/Lease #305 Bellevue |
| Date: | Thursday, August 27, 2020 8:44:16 PM |

I think it best that a bankruptcy attorney, in consultation with myself as to Washington real estate lawyer, responds to your email below.  Nothing in my prior email confirmed anything related to a March 2020 exercise of option.  My prior email pointed out my client had signed an extension agreement drafted by CEC  to which minor changes were made.   Not being privy to the bankruptcy file, having received no notices and court orders, it is best I defer comment until consultation with a bankruptcy attorney.

However, in the interim, we have no intention of violating an automatic stay.

MARTIN BURNS

**BURNS LAW, PLLC**
524 Tacoma Ave. S.
Tacoma, WA 98402

(253) 507-5586  phone
(253) 405-7634  cell
(253) 507-5713  fax

**From:** Genender, Paul [mailto:Paul.Genender@weil.com]
**Sent:** Wednesday, August 26, 2020 3:09 PM
**To:** Martin Burns <Martin@mburnslaw.com>
**Cc:** Bowling, Scott <Scott.Bowling@weil.com>; Pennington Prugh, Amanda <Amanda.PenningtonPrugh@weil.com>; Rutherford, Jake <Jake.Rutherford@weil.com>
**Subject:** RE: CEC/Lease #305 Bellevue

Mr. Burns:

Thanks for your response and confirming that your client will not seek to terminate the Lease or evict CEC. Based on that representation, Debtors will not proceed with the emergency motion referenced below but will reserve all rights in any event.

I also note that the proposed amendment you sent is of no moment and instead what does matter is the option CEC exercised in March 2020.

I take your email to confirm that your client will honor the valid option CEC exercised.

I am familiar with the conversations you have had with my client and those between Hilco and your

client.

I am glad your client will consult bankruptcy counsel in Texas. Please have her or him contact me with any questions.  In the meantime, please let me know if you have any questions.

Thanks very much.  Paul



**Paul R. Genender**
Partner

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
paul.genender@weil.com

+1 214 746 7877 Direct
+1 214 914 4162 Mobile
+1 214 746 7777 Fax

---

**From:** Martin Burns <Martin@mburnslaw.com>
**Sent:** Wednesday, August 26, 2020 3:14 PM
**To:** Genender, Paul <Paul.Genender@weil.com>
**Cc:** Bowling, Scott <Scott.Bowling@weil.com>; Pennington Prugh, Amanda <Amanda.PenningtonPrugh@weil.com>; Rutherford, Jake <Jake.Rutherford@weil.com>
**Subject:** RE: CEC/Lease #305 Bellevue

Dear Mr. Genender:

My client has no intention of presenting filing an eviction.   We have no intention of violating an automatic stay.  That is why I wrote in my last letter:  "Absent a positive response, I will be referring my client to a bankruptcy attorney to review the filings in this case and to thereafter take appropriate action in compliance with any obligations/restrictions imposed by the filing of the bankruptcy."   At no place in the prior letter did we threaten an eviction at all.

I see no reason at all for an emergency order as we are taking no action in violation of the automatic stay.  We intend to refer DSL Overlake, LLC to appropriate Bankruptcy counsel in the Dallas area to confer as to what, if any, action is needed.

As for the extension, my clients sent a signed extension agreement to CEC on June 10, 2020 and it

has never been signed and returned to our knowledge.   A copy of which is attached.  Accordingly, I am not sure what you are referencing in your email.  If you file the emergency motion, I would ask that you provide the court this email and this extension agreement was signed by my client. Understand, this was an extension agreement drafted by CEC to which we made a few minor changes, signed and returned.

So again, I see no reason for any need for an emergency motion at all.

I was away from my phone but am available now should you wish to call.


MARTIN BURNS

**BURNS LAW, PLLC**
524 Tacoma Ave. S.
Tacoma, WA 98402

(253) 507-5586  phone
(253) 405-7634  cell
(253) 507-5713  fax

---

**From:** Genender, Paul [mailto:Paul.Genender@weil.com]
**Sent:** Wednesday, August 26, 2020 12:24 PM
**To:** Martin Burns <Martin@mburnslaw.com>
**Cc:** Bowling, Scott <Scott.Bowling@weil.com>; Pennington Prugh, Amanda <Amanda.PenningtonPrugh@weil.com>; Rutherford, Jake <Jake.Rutherford@weil.com>
**Subject:** CEC/Lease #305 Bellevue

Martin,

I left you a VM on your cell.  My firm represents CEC Entertainment, Tenant for the referenced lease and a Debtor in a pending bankruptcy case in the Southern District of Texas (Houston).

As I said in my voicemail, I was reaching out to confer before we file our "DEBTORS' EMERGENCY MOTION TO ENFORCE
THE AUTOMATIC STAY AGAINST DSL OVERLAKE, LLC" later today, which we will seek to have heard this Friday (8/28) or Monday (8/31) on an expedited basis to prevent your client's threatened actions for occurring.

To put a finer point, here is the summary of our motion which I am sharing in full transparency so you can decide how to proceed.  Please consider this and let me know if your client wants to honor the valid extension entered in March 2020.

"Despite a valid extension of the Lease[1] through August 2025 and the protections afforded to the Debtors by the Automatic Stay, landlord DSL Overlake, LLC ("**DSL**"), with no basis or justification, has threatened to remove the Debtors from the Premises by midnight on Monday, August 31, 2020, unless the Debtors agree to pay certain pre-petition amounts.  The Debtors cannot (and should not have to) comply with DSL's misplaced, improper demands in light of (among other things) the plain terms of the Lease and the Automatic Stay.  Accordingly, the Debtors have no choice but to file this Motion to Enforce on an emergency basis and seek the relief requested in the Proposed Order."

I look forward to your prompt response.

Paul



**Paul R. Genender**
Partner

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
paul.genender@weil.com

+1 214 746 7877 Direct
+1 214 914 4162 Mobile
+1 214 746 7777 Fax

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

CONFIDENTIALITY NOTE: This transmission may contain information belonging to the sender that is confidential and/or legally privileged. The information is intended for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, please delete it immediately and notify us by telephone of the error so we may correct our records. IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, you are informed that unless expressly indicated otherwise, any federal tax advice contained in this communication (including in any attachments) is not intended or written by Martin Burns or Burns Law, PLLC to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein or in any attachments.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

[1] All capitalized terms not otherwise defined in this Preliminary Statement are defined below in the Motion to Enforce.